## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **ROBERT ODELL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:12-CV-04345-BH** |
| | § | |
| **CAROLYN W. COLVIN, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Consent Case** |

## MEMORANDUM OPINION AND ORDER

By order filed December 5, 2013, this matter has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court is *Plaintiff's Brief on Review of the Denial of Benefits by the Commissioner of the Social Security Administration*, filed March 4, 2013 (doc. 16). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is wholly **AFFIRMED.**

## I. BACKGROUND[1]

### A.   Procedural History

Robert Odell (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act. (R. at 1–3.) On September 29, 2010, Plaintiff applied for DBI, alleging disability beginning on August 2, 2010, due to rheumatoid arthritis. (R. at 157–64, 176.) His application was denied initially and upon reconsideration. (R. at 91–94, 98.) Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and he personally appeared and testified at a

---

[1]   The background information is summarized from the record of the administrative proceedings, which is designated as "R."

hearing held on September 19, 2011.  (R. at 38–87.)  On November 22, 2011, the ALJ issued his

decision finding Plaintiff not disabled.  (R. at 27–34.)  He requested review of the ALJ's decision,

and the Appeals Council denied his request on September 24, 2012, making the ALJ's decision the

final decision of the Commissioner.  (R. at 1–3.)  He timely appealed the Commissioner's decision

pursuant to 42 U.S.C. § 405(g).  (doc. 1).

**B.**     **Factual History**

    **1.**     **Age, Education, and Work Experience**

Plaintiff was born on October 28, 1956; he was 54 years old at the time of the hearing before

the ALJ.  (R. at 41.)  He graduated from high school and served in the U. S. Army from 1976 to

1980.  (R. at 42–43.)  He has past relevant work as a contractor and store stocker.  (R. at 43–47.)

    **2.**     **Medical Evidence, Psychological, and Psychiatric Evidence**

        a.     Evidence Before Plaintiff's Date Last Insured

On February 17, 2009, Jacinthe Ventura, M.D., a physician at S.E. Louisiana Veterans

Healthcare Systems (LA Veterans), examined Plaintiff regarding his "chronic neck pain that started

in 1995 with no inciting event" and numbness and tingling in his fingers.  (R. at 353.)   A magnetic

resonance imagining (MRI) taken that day revealed a posterior midline protrusion of the disk at

C3–C4, which suggested a "ventral thecal sac with mild deformity of the ventral cord."[2]  (R. at 354.)

Dr. Ventura issued "provisional diagnoses" of cervical spondylosis and carpal tunnel syndrome,

prescribed him a prosthetic aid for his right wrist, and referred him for physical therapy.  (R. at

350–53.)  When Plaintiff followed up on August 18, 2009, he complained of joint pain that he rated

at 7 on a 10-point scale but "denie[d] [any] acute concerns."  (R. at 361.)  His pain was triggered by

---

[2]  Plaintiff scheduled but later canceled an electronyography (EMG) due to "schedule conflicts."  (R. at 357.)

"working" and affected his sleep, physical activities, ability to work, and temperament. (*Id.*)

On November 3, 2009, Plaintiff presented to Dallas Veteran's Administration Medical Center (VA Medical) complaining of constant pain in all of his joints for the past year. (R. at 245.) He explained that his pain was constant and worsened with exercise, movement, touching and manipulation, and standing and walking. (*Id.*) X-rays of Plaintiff's hands revealed a slight dislocation of his metacarpophalengeal (MCP) joint in his right hand and "questionable" subchondral cystic changes in his right thumb. (R. at 235, 251.) There was also "mild narrowing with subcondral sclerosis" of the first CMC joint of his left wrist, which Robina Chowdhery, M.D., the examining physician, opined could indicate "arthritic changes." (*Id.*) The joint spaces in his right hand were preserved, the carpal arches were "well aligned," and his wrist joint appeared normal. (R. at 252.) There was mild "narrowing with subchondral sclerosis" of his first metacarpal joint in his left hand. (*Id.*) The final impression was "minor abnormality." (*Id.*)

Plaintiff returned to VA Medical on December 10, 2009, to follow up with his pain and undergo additional testing. (R. at 242.) He reported having pain in all of his joints, including wrists, fingers, ankles, and feet. (R. at 237, 242.) He also complained of stiffness that lasted for about an hour after rising from bed in the morning. (R. at 237.) He rated his pain at 7 on a 10-point scale. (*Id.*) Dr. Chowdhery examined him again on December 31, 2009. (R. at 231–35.) She observed distal interphalangeal (DIP) "bony hypertrophy" in his upper extremities, "slight cervical kyphosis," "crepitus" in both knees, swelling and tenderness in his carpometacarpal (CMC) joints, and swelling in his right toes. (R. at 231, 234.) X-ray impressions showed mild degenerative changes of his lumbar and thoracic spine, but his "cervical spine [was] normal." (R. at 250.) X-rays also showed "mild" degenerative joint disease in both feet and "mild arthritic change in the tarsal joints" of his

hands.  (R. at 251.)  Dr. Chowdhery diagnosed him with polyarthralgias,[3] continued his pain medication, and instructed him to take "warm soaks" to ease the discomfort in his joints.  (R. at 235.)

On January 10, 2010, Plaintiff saw Robert Silverman, M.D., a consultative examiner for disability determination services.  (R. at 271.)  He told Dr. Silverman that he had experienced joint pain for the past ten years.  (*Id.*)  The pain had started as a "tingling" sensation in his right arm and leg, but currently every joint in his body hurt.  (*Id.*)  He took numerous medications for his symptoms, including Ibuprofen, Etodolac, Tramadol, and Cymbalta.  (*Id.*)  He told Dr. Silverman that he could sit for only 30 minutes, stand for only 45 minutes, and walk about 100 yards before having to stop due to his pain.  (*Id.*)

Upon a physical examination, Dr. Silverman found that Plaintiff was "well-developed, well-nourished," and in "no acute distress."  (R. at 272.)  He had a regular heart rate and rhythm and had a "full range of motion without swelling, redness, or warmth" in all of his joints.  (*Id.*)  Dr. Silverman found that he had "no gross focal neurologic deficits."  (R. at 273.)  Although Plaintiff walked with a "slightly antalgic gait," he had no need of assistive devices.  (*Id.*)  He had difficulty walking on his toes due to the deformity of "his right second toe," but he could walk "on his heels" and "heel-to-toe."  (*Id.*)

Dr. Silverman reviewed Plaintiff's X-rays, "rheumatoid factor, and sedimentation rate," and concluded that there was no "evidence of rheumatoid arthritis."  (*Id.*)  He acknowledged Plaintiff's allegations of "chronic joint pain," "review[ed] his medications," and noted that he "ha[d] been treated most recently for . . . fibromyalgia."  (*Id.*)  His prognosis was "guarded."  (*Id.*)

---

[3]     Arthralgia is an ache or "pain in a joint."  *See* Medicine.Net.com http://www.medterms.com/script/main/art.asp?articlekey=2343 (last visited Mar. 21, 2014).

On January 28, 2010, upon a referral from Van M. Nguyen, M.D., an internal medicine specialist at VA Medical, Plaintiff saw Kara Prescott, M.D., for a dermatology consultation regarding his actinic keratosis. (R. at 232.) He told Dr. Prescott that he had "intermittent joint pain since and during [his] military service." (R. at 234.) He felt pain on his left side and in his upper and lower extremities, but he "denie[d] inflammatory back pain symptoms or [morning] stiffness." (*Id.*) Dr. Prescott observed that he appeared well-developed, well-nourished, alert, oriented, and was in no apparent distress. (*Id.*) An examination revealed a "single scaly whitish pauple on his left lower eyelid," scattered tan to brown waxy papules on face, trunk, arms, and legs, "moth-eaten mascules" on his shoulders, and abnormal dryness in his hands and cracking of his fingers. (R. at 232.) Dr. Prescott prescribed him medication and instructed him to follow-up as needed. (R. at 233.)

A few days later, Plaintiff presented to Kaufman Community Health Center (Kaufman CHC) complaining of body aches and depression. (R. at 260.) The examining physician diagnosed him with high blood pressure and tobacco abuse and discontinued his anti-depressant. (*Id.*) Plaintiff saw Dr. Chowdhery at VA Medical a few days later and complained of muscle weakness, dry eyes and mouth, shortness of breath, and a rash. (R. at 230.) Dr. Chowdhery continued his Etodolac to treat his arthralgias, instructed him to continue taking warm baths, and referred him for an EMG. (*Id.*)

On August 13, 2010, Plaintiff returned to Kaufman CHC and was diagnosed with osteoarthritis, spondylosis, high blood pressure, arthritis, and tobacco abuse. (R. at 263.) The physician prescribed him medication for his symptoms. (*Id.*) On October 14, 2010, during his last visit to Kaufman CHC on file, he complained of joint muscle pain in his hands and feet, which he rated at 8 on a 10-point scale, and depression. (R. at 261.) The doctor prescribed him Cymbalta for

his depression.  (*Id.*)

        b.      <u>Evidence After Plaintiff's Date Last Insured</u>

On February 15, 2011, Laurence Ligon, M.D., a state agency medical consultant (SAMC), reviewed Plaintiff's medical records and completed a physical Residual Functional Capacity (RFC) assessment.  (R. at 277–84.)  Dr. Ligon listed "arthralgias" as Plaintiff's "primary diagnosis."  (R. at 277.)  He determined that Plaintiff had the following physical RFC: lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight with hand and foot controls; and no postural, manipulative, visual, communicative, or environmental limitations.  (R. at 278–81.)  He noted Plaintiff's comments to Dr. Silverman during his January 10, 2010 examination that his joint pain began in 2000.  (R. at 284.)  He considered important Dr. Silverman's observations that Plaintiff walked with an antalgic gait but had no need of an assistive device, was neurologically "intact," and could walk on his heels and "heel-to-toe."  (*Id.*)  He stated that his RFC assessment accounted for Plaintiff's allegations of pain.  (*Id.*)

On May 4, 2011, Thomas Geary, Ph.D., a state agency psychological consultant, reviewed Plaintiff's treatment records and completed a Psychiatric Review Technique Form (PRTF).  (R. at 285–96.)  He compared Plaintiff's depression to listing 12.04 for affective disorders.  (R. at 285.)  Under "paragraph B," Dr. Geary stated that there was "insufficient evidence" to determine whether Plaintiff had any "functional limitations" in his activities of daily living or in maintaining social functioning, concentration, persistence, or pace, or whether he had experienced episodes of decompensation of extended duration.  (R. at 295.)  He noted Plaintiff's failure to list any mental illness in his initial application for benefits.  (R. at 297.)  He considered noteworthy Plaintiff's lack

of mentally-related hospitalizations, as well as his ability to engage in activities of daily living such as taking care of his personal hygiene, preparing meals, driving a car, shopping for groceries, paying bills, interacting with his grandchildren, and attending church and doctors' appointments. (*Id.*) He concluded that there was insufficient evidence in the record to "determine [Plaintiff's] actual impairments due to depression" prior to his date last insured. (*Id.*)

On August 16, 2011, Plaintiff saw Dr. Nguyen at VA Medical for a follow up consultation. (R. at 333–40.) Dr. Nguyen noted that he last saw Plaintiff in December 2009. (R. at 334.) Plaintiff's chief complaint that day was degenerative joint disease that caused pain in his neck, shoulder blades, elbows, wrists, hands, knees, ankles, and feet. (*Id.*) A physical examination revealed that Plaintiff had no fever, chills, heart palpitations, or weight loss. (*Id.*) Dr. Nguyen indicated that Plaintiff had "no morning stiffness" under the section relating to his muscular system. (*Id.*) He observed "chronic changes" in Plaintiff's hands and opined that he had "significant [degenerative joint disease] from [his] previous construction work." (R. at 335–36.)

That day, Dr. Nguyen also completed a "Degenerative Joint Disease" RFC questionnaire. (R. at 341–45.) He indicated that he saw Plaintiff twice a year for his degenerative joint disease and his prognosis was "poor" because Plaintiff's condition remained unchanged. (R. at 342.) He stated that X-rays of Plaintiff's "entire spine" and bilateral hands revealed "chronic changes in [his] hands consistent with [degenerative joint disease]." (*Id.*) He listed Plaintiff's symptoms as chronic fatigue, morning stiffness, numbness and tingling, and depression, and opined that emotional factors also contributed to the severity of his physical impairments. (R. at 342–43.) He also indicated that Plaintiff experienced pain in his right shoulder, chest, arms, hands, fingers, hips, legs, knees, ankles, and feet. (R. at 343.) Plaintiff's pain, which he rated at 7 on a 10-point scale, was constant and

-7-

aggravated by movement, "overuse," and cold weather.  (*Id.*)

In Dr. Nguyen's opinion, Plaintiff was not a "malingerer."  (*Id.*)   He opined that Plaintiff was incapable of performing "even low stress jobs" and referenced his allegation that he could walk for only one city block.  (*Id.*)  Lastly, he explained that as an internal medicine specialist, he was "not certified" to opine about Plaintiff's physical RFC limitations such as his ability to stand, sit, or walk in an 8-hour workday, the amount of weight he could lift, or how often he could perform certain physical activities such as stooping, crouching, or climbing ladders and stairs.  (*Id.*)

**3.      Hearing Testimony**

On September 19, 2011, Plaintiff, a psychological expert (PE), a medical expert (ME), and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 41–87.)  Plaintiff was represented by an attorney.  (R. at 41.)

**a.      *Plaintiff's Testimony***

Plaintiff testified that he was 54 years old, married, and raising a granddaughter.  (R. at 42.)  He had a high school education.  (*Id.*)  He was 5 feet 8 inches tall, weighed 160 pounds, and was right-handed.  (*Id.*)

Plaintiff served in the U.S. Army from 1976 to 1980.  (R. at 43.)  From 1981 until August 2010, he worked as a self-employed construction contractor doing primarily "remodeling-type work" including carpentry, electrical work, plumbing, bathtub resurfacing, roofing, and "sheetrocking" walls.  (R. at 43–44.)  The greatest weight he lifted was between 300 and 400 pounds.  (R. at 47.)

Plaintiff also worked at Wal-Mart shelving and stocking items for about three months between 2009 and 2010.  (R. at 47–48.)  The heaviest weight he lifted was between 40 and 50

pounds. (*Id.*) He left this job because his feet hurt after standing on the concrete floor all day, and he felt a "burning" sensation in his hands and feet "all the time." (R. at 48–49.)

Plaintiff began treatment for his pain at VA Medical in 1990. (R. at 49–51.) The doctors there diagnosed him with degenerative joint disease and prescribed him Cymbalta for his depression and Lyrica for his pain. (*Id.*) He went to physical therapy, but it did not help. (R. at 52.) Although he "blew out" his left knee in the Army due to all the running he did, the doctors told him that his joint pain was not related to his service. (R. at 53.) He saw a psychiatrist once at VA Medical, but he did not see her again because he did not like sharing his problems with others. (R. at 55.) More recently, a doctor at Kaufman CHC prescribed him Amitriptyline for his depression. (*Id.*) At some point, he also took Prozac and Cymbalta to treat his depressive symptoms. (R. at 56.)

Plaintiff had difficulty walking because he felt a constant, aching pain in his heels and ankles. (*Id.*) The longest he could walk before stopping to rest was one city block. (R. at 57.) He felt constantly fatigued and also experienced on-going pain in his hands. (*Id.*) He could bathe and dress himself but had difficulty buttoning his clothes and tying his shoes because his hands were "so stiff." (R. at 58.) After getting up in the morning, it usually took him "about an hour or two to get warmed up" and be able to move and bend his legs. (*Id.*) During the day, he spent most of his time sitting outside. (R. at 59.) He could not sit for more than 20 minutes without getting stiff and feeling numbness and tingling in his right leg, buttocks, and right foot. (R. at 61.) He could not stand for more than 20 minutes without feeling pain in his feet, toes, and ankles. (R. at 62.) If he lifted more than 10 pounds, he experienced a sharp pain in his fingers. (R. at 63.) He could perform physical labor in his construction job, but he could no longer do that due to his joint pain. (R. at 64.) When he was a stocker at Wal-Mart, he had difficulty grasping and opening boxes. (R. at 65.)

On examination by counsel, Plaintiff testified that he experienced numbness in his hands and feet that made it difficult for him to drive.  (*Id*.)  He was not strong enough to open jars.  (*Id*.)  He got headaches that lasted 4 to 6 hours and had difficulty concentrating and remembering things.  (R. at 67, 69.)  He took Gabapentin for his "neurological" pain.  (R. at 68.)  He slept for only 4 to 5 hours per night and often struggled to complete tasks due to his low energy.  (R. at 68, 70.)

### b.      PE's Testimony

The PE, an expert in "clinical psychology," testified that Plaintiff had been diagnosed with "reactive depression," which meant that he was responding to "some type of event" or a situation, as opposed to suffering from "endogenous" depression.  (R. at 72.)  He explained that in August 2010, doctors prescribed Plaintiff Lexapro and Prozac, but they later discontinued Prozac because "he felt odd or unusual."  (*Id*.)  At the time of the hearing, Plaintiff was taking Amitriptyline for his symptoms. (R. at 73.)

The PE explained that sometimes depression is caused by physical pain and other life changes.  (*Id*.)  Because Plaintiff was screened for depression at VA Medical in August 2011 and his results were negative, the PE concluded that he was not clinically depressed but only had "some mild depressive reaction to his overall situation."  (*Id*.)  He opined that Plaintiff's depression was "not severe" because it did not cause "any significant limitations in his function" and did not affect his ability "to live his life or to do the things he normally would" do.  (R. at 74.)  In response to counsel's question, he clarified that Plaintiff had not undergone any psychological or psychiatric consultative examinations.  (*Id*.)

### c.      ME's Testimony

The ME stated that he was "a semi-retired internist" and was familiar with Plaintiff's medical

records.  (R. at 74–75.)  He testified that Plaintiff had a long history of joint pain and was diagnosed

with arthralgias at VA Medical in late 2009.  (*Id*.)  At the time of the diagnosis, Plaintiff smoked one

pack of cigarettes a day and was not taking regular medications.  (*Id*.)  The ME referenced Dr.

Silverman's consultative observations in January 2010, that Plaintiff's "joint exam was entirely

normal with [a] full range of motion," he did not have any deformity other than in his right second

toe, and had "a normal sed rate and rheumatoid factor."  (R. at 76.)  He also referenced Dr.

Chowdhery's notations from December 10, 2009, that Plaintiff "had [a] slight crepitation" and

possibly "early degenerative joint disease" in his knees.  (*Id*.)  He pointed to X-rays of Plaintiff's

cervical spine taken that day were "negative", and concluded that there was "very little objective

evidence to support" his allegations about the limiting effects of his symptoms.  (*Id*.)  He explained

that arthralgias differed from arthritis because these were merely "subjective," meaning that there

was no objective evidence to corroborate them, such as X-ray changes, swelling, limited range of

motion, localized tenderness, redness, or heat sensation to corroborate his complaints.  (*Id*.)

In response to counsel's question, the ME testified that he did not "take particular note" of

the degenerative changes in Plaintiff's lumbar and thoracic spine shown in the December 10, 2009

X-rays because such changes were "compatible" with his age and constituted an "average finding."

(R. at 77.)  The ME noted although Dr. Chowdhery referred Plaintiff for an EMG in January 2010,

that as of the date of the hearing, the test had not been conducted.  (*Id*.)  He acknowledged that one

of Plaintiff's doctors issued differential diagnoses of "fibromyalgia" and "seronegative rheumatoid

arthritis" in December 2009, but opined that these were only "speculations" since there was "no

proven diagnosis." (*Id*.)  He also explained that a "rheumatoid arthritis" diagnosis generally requires

objective evidence, such as "synovitis, swelling, heat, and localized tenderness," and Plaintiff had

not exhibited any of those symptoms and had a full range of motion.  (R. at 78–79.)

Counsel pointed to recent treatment notes from Kaufman CHC showing that Plaintiff was diagnosed with peripheral neuropathy, fibromyalgia, and chronic pain syndrome. (*Id.*)  The ME responded that those "sound[ed] like scatter-shooting speculative diagnoses" because the doctor had not "made a firm diagnosis" and there was "[n]o documentation" of those diseases in the record. (R. at 80.)  Counsel also pointed to Dr. Nguyen's opinions that Plaintiff had "limitations" in his bilateral chest, shoulders, arms, hands, fingers, hips, legs, knees, ankles, and feet. (R. at 81.) According to the ME, those opinions were based on Plaintiff's own subjective complaints. (*Id.*)  The "most restrictive RFC" that the ME could assign him was the ability to perform medium work.  (R. at 76.)

     *d.*  **VE's Testimony**

The VE classified Plaintiff's past relevant work as a carpenter and home "remodeler" (heavy, skilled, SVP-7) and a stocker (medium, unskilled, SVP-2).  (R. at 80–81.)  The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work experience could perform his past relevant work if he had "non-severe" mental impairments and the physical RFC to perform the "full range of medium work."  (R. at 81–82.)  The VE opined that the hypothetical person could perform Plaintiff's past relevant work as a stocker.  (R. at 82.)  The ALJ added the following limitations to the hypothetical: walk for only one city block, sit for 20 minutes, stand for 20 minutes, and lift only 10 pounds.  (*Id.*)  The VE opined that the person could not perform any of Plaintiff's past relevant work nor any other job in the national economy because the limitation to lift 10 pounds restricted him to "sedentary" work.  (R. at 82–83.)

## C.  <u>ALJ's Findings</u>

The ALJ issued his decision denying benefits on November 22, 2011.  (R. at 27–35.)  At step

one, he found that Plaintiff had not engaged in substantial gainful activity (SGA) since his alleged

onset date of August 2, 2010, through December 31, 2010, the date he was last insured.  (R. at 29.)

At step two, he found that Plaintiff's "chronic joint pain" was his only severe impairment.  (*Id.*)  At

step three, the ALJ determined that Plaintiff's impairment did not meet or medically equal any

impairment listed in the regulations.  (R. at 30.)

Before proceeding to step four, the ALJ determined that Plaintiff had the physical RFC "to

perform a full range of medium work."  (*Id.*)  At step four, with the VE's testimony, the ALJ

determined that Plaintiff could perform his past relevant work as a stocker.  (R. at 34.)  Accordingly,

the ALJ concluded that Plaintiff was not disabled, as the term is defined under the Social Security

Act, at any time between his alleged onset date and the date he was last insured.

## II.    ANALYSIS

### A.    Legal Standards

#### 1.    Standard of Review

Judicial review of the commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g), 1383(c)(3).  Substantial evidence is defined as more than a

scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a

reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the

record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*,

38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Id.*  The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mentla impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-stop inquiry to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

-14-

3.      An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4.      If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greendspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.  *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      Issue for Review**

Plaintiff presents one issue for review:

The RFC finding is representative of the most an individual can do in the workplace on a regular and continuing basis.  It must be supported by substantial evidence.  The ALJ found [Plaintiff] capable of performing a full range of medium work.  Is the RFC finding supported by substantial evidence when it fails to consider directly contradicting evidence of the limitations caused by [Plaintiff's] impairments?

(Pl. Br. at 1.)

## C.   <u>Treating Opinion Evidence</u>[4]

Plaintiff contends that the ALJ erred in assessing his RFC because he improperly rejected Dr. Nguyen's treating opinions in his August 16, 2011 RFC questionnaire regarding Plaintiff's hand and other non-exertional impairments.  (Pl. Br. at 9–12.)

### *1.   Evidence Relevant to Plaintiff's Disability Period*

Where a claimant seeks DIB under Title II, the relevant disability period dates from his alleged onset date to his date last insured.  *Herndon v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-240-N, 2012 WL 987582, at *3 n.3 (N.D. Tex. Feb. 27, 2012), *rec. adopted*, 2012 WL 987568 (N.D. Tex. Mar. 23, 2012).  If the claimant's alleged onset date is "less than 12 months" before he filed his application, the Commissioner "will develop [the claimant's] complete medical history beginning with the month [the alleged] disability began unless [there is] reason to believe [the] disability began earlier."  20 C.F.R. § 404.1512(d)(2).  "If applicable," the claimant's "complete medical history" is developed "for the 12–month period prior to [] the month [he was] last insured." *Id.*

In addition, "to prove that she is entitled to disability benefits, [the claimant] must not only prove that she is disabled, but that she became disabled prior to the expiration of her insured status." *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992) (citing 42 U.S.C. § 423(a),(c)); *see also* 20 C.F.R. § 404.131(b)(2) ("To become entitled to disability insurance benefits, you must have disability insured status in the first full month that you are disabled as described in § 404.1501(a)

---

[4]  Although Plaintiff briefs this issue as part of his RFC issue, it is addressed separately because it involves a different analysis.

. . . .").  Consequently, "[e]vidence showing a degeneration of a claimant's condition after the expiration of his Title II insured status is not relevant to the Commissioner's Title II disability analysis." *McLendon v. Barnhart*, 184 F. App'x 430, 431 (5th Cir. 2006) (citing *Torres v. Shalala*, 48 F.3d 887, 894 n. 12 (5th Cir.1995)).  As an exception, the Fifth Circuit has held that "an ALJ may not refuse to consider retrospective medical diagnoses uncorroborated by contemporaneous medical reports but corroborated by lay testimony." *Barraza v. Barnhart*, 61 F. App'x 917 (5th Cir. 2003) (citing *Likes v. Callahan*, 112 F.3d 189, 190–91 (5th Cir. 1997)).  Nevertheless, to "constitute relevant evidence of pre-expiration disability," "a retrospective opinion must refer clearly to the relevant period of disability and not simply express an opinion [regarding] the claimant's current status." *McLendon*, 184 F. App'x at 432.

Here, the relevant disability period for Plaintiff's DIB claim under Title II began on his alleged onset date of August 2, 2010, and ended on December 31, 2010, the date he was last insured. *See Herndon*, 2012 WL 987582, at *3 n.3.  Since he does not allege that there was any "reason to believe [that his] disability began earlier," his relevant medical history spanned from August 2010 to December 31, 2010.  *See id.*; *see also* 20 C.F.R. § 404.1512(d)(2).

## 2. Dr. Nguyen's August 16, 2011 RFC Questionnaire

Plaintiff contends that the ALJ improperly rejected Dr. Nguyen's opinions in his August 16, 2011 RFC questionnaire regarding "the severity of and functional limitations" caused by Plaintiff's "hand impairments" as well his non-exertional impairments of "pain, chronic fatigue, morning stiffness, numbness and tingling, and depression."  (Pl. Br. at 9–12.)

Every medical opinion is evaluated regardless of its source, but the Commissioner generally

gives greater weight to opinions from a treating source.[5] 20 C.F.R. § 404.1527(c)(2).  When "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give that opinion controlling weight.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citing 20 C.F.R. § 404.1527(c)(2)).  If controlling weight is not given to a treating source's opinion, the Commissioner generally applies six factors[6] in deciding the weight given to this and all other medical opinion evidence in the record. *Id.*

Nevertheless, a treating physician's opinion may be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id.* at 455–56.  A factor-by-factor analysis is also unnecessary where "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another", or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion."  *Id.* at 458.

Here, before proceeding to step four, the ALJ determined that through the date last insured, Plaintiff had the physical RFC to perform a full range of medium work.  (R. at 30.)  In determining

---

[5] A treating source is the claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502 (2012).

[6] These factors are: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  20 C.F.R. § 404.1527(c)(1)–(6).

Plaintiff's physical RFC, the ALJ noted that although Plaintiff "regularly reported pain in [his] hands, ankles, feet, back, neck, and shoulder," his doctors prescribed him "essentially routine and/or conservative" treatment.  (R. at 32.)  He acknowledged Plaintiff's testimony that he had "difficulty sitting, standing, and walking," suffered from hand and back pain, and had "trouble buttoning his clothes and tying his shoes."  (R. at 31.)  He determined that in light of the "objective findings" and Plaintiff's conservative treatment, his allegations were "not fully credible to the extent they [were] inconsistent with" the ALJ's RFC assessment.  (R. at 31, 33.)

The ALJ stated that he considered the opinion evidence as required by 20 C.F.R. § 404.1527 in assessing Plaintiff's physical RFC.  (R. at 31.)  He referenced and implicitly adopted Dr. Silverman's consultative findings on January 10, 2010, that Plaintiff had a "full range of motion without swelling, redness, or warmth" in all his joints and had no neurological deficits.  (R. at 32, 272.)  He likewise accepted the examiner's observation that there was "no evidence of rheumatoid arthritis."  (R. at 32, 273.)  He acknowledged but gave "limited weight" to the consultative RFC assessment of Dr. Ligon, an SAMC, that Plaintiff "could perform light work," explaining that "the objective findings" in the record did "not substantiate" such a restrictive RFC.  (R. at 32, 278–81.)  The ALJ referenced the ME's testimony that the evidence did "not support a diagnosis of arthralgias" and expressly adopted his opinion that through his date last insured, Plaintiff had the physical RFC to perform the full range of medium work.  (R. at 32, 75.)  He concluded that there was "no opinion evidence [] in the record, [that] support[ed] the level of severity alleged by [Plaintiff]."  (R. at 34.)

The ALJ's narrative discussion did not discuss or even mention Dr. Nguyen's August 16,

2011 questionnaire.[7]  (*See* R. at 27–34.)  Because the questionnaire was completed nearly eight months after Plaintiff's date last insured status, it was irrelevant to the ALJ's disability determination for that reason alone.  *See Torres*, 48 F.3d at 894 n. 12.  Moreover, although Dr. Nguyen indicated that an examination showed "chronic changes" in Plaintiff's hands indicative of degenerative joint disease, nowhere in the form did he "clearly" state that Plaintiff suffered from this condition before December 31, 2010, the date that he was last insured.  (*See* R. at 342–45.) Consequently, his statements were not "retrospective" opinions.  *See Copenhaver v. Astrue*, No. A-09-CA-838-SS, 2011 WL 891617, at *3 (W.D. Tex. Mar. 11, 2011) ("[T]he evidence [the claimant] relies on does not involve a 'retrospective medical diagnosis,' but rather involves her treating physicians' views on her impairments as they stood at the time of the treatment—which was after the date last insured.") (*see also* R. at 342–45).  Accordingly, the ALJ had good cause to give little weight or even reject Dr. Nguyen's questionnaire.  *See Hinkle v. Astrue*, No. 4:11-CV-03409, 2012 WL 9391858, at *8 (S.D. Tex. Dec. 4, 2012) (holding that "[t]he ALJ did not err in giving [the treating physician's] opinion little weight" where his "assessment was completed long after the date [the claimant] was last insured" and it was not a retrospective opinion); *Lottinger v. Astrue*, No. 4:09–CV–971, 2010 WL 744245, at *6 (S.D. Tex. Feb. 26, 2010) (to same effect); *see also Johnson v. Barnhart*, 434 F.3d 650, 656 (4th Cir. 2005) (affirming an ALJ's rejection of a treating physician's assessment that was completed nine months after the claimant's date last insured).

---

[7] In his questionnaire, Dr. Nguyen indicated that he saw Plaintiff twice a year for his degenerative joint disease and his prognosis was "poor" because his condition remained unchanged.  (R. at 342.)  He stated that X-rays of Plaintiff's spine and bilateral hands revealed "chronic changes" in his hands consistent with degenerative joint disease. (*Id.*)  He listed Plaintiff's symptoms as chronic fatigue, morning stiffness, numbness and tingling, and depression, and opined that emotional factors also contributed to the severity of his physical impairments. (R. at 342–43.)  He indicated that Plaintiff experienced pain in his right shoulder, chest, arms, hands, fingers, hips, legs, knees, ankles, and feet.  (R. at 343.)  He explained that as an internal medicine specialist, he was "not certified" to form opinions about the effects of Plaintiff's impairments on his physical RFC.  (R. at 345.)

Even assuming for the sake of the argument that Dr. Nguyen's questionnaire was applicable to Plaintiff's relevant disability period, the ALJ could properly reject it without performing a factor-by-factor analysis because Dr. Nguyen's statements were discredited by inconsistencies in his own consultation notes from the same day and were contradicted by other first-hand medical opinions. For instance, Dr. Nguyen indicated in the questionnaire that he saw Plaintiff "twice a year," but in his consultation notes he wrote that he last saw Plaintiff in December 2009 and that Plaintiff had "failed to [follow up]." (*See* R. at 334.) In the questionnaire, he wrote that Plaintiff experienced "about 1 hour of stiffness" in the morning, but in his consultation notes he indicated "no morning stiffness" in the section relating to a physical examination. (*See* R. at 334–35.)

Moreover, Dr. Nguyen's notations in the questionnaire that Plaintiff had morning stiffness, numbness, and tingling—which, according to the ME were based on Plaintiff's subjective complaints (R. at 81)—were at odds with Dr. Silverman's objective findings a few months earlier that Plaintiff had a full range of motion without swelling, redness, or warmth in all of his joints and had no neurological deficits. (*See* R. at 272, 342.) Dr. Silverman reviewed Plaintiff's X-rays, rheumatoid factor, and sedimentation rate, and he opined that he showed no signs of rheumatoid arthritis. (R. at 273.) When Plaintiff saw Dr. Prescott on January 28, 2010, for a dermatology consulation, he denied having "[morning] stiffness." (*See* R. at 234.) It was proper for the ALJ to accept Dr. Silverman's consultative findings even if they conflicted with Dr. Nguyen's statements because the "ALJ may accept the opinion of a consulting, examining physician over the opinion of the treating physician." *Copeland v. Shalala*, 992 F.2d 324, at *2 (5th Cir. 1993) (per curiam) (citation omitted); *Franzen v. Astrue*, 555 F. Supp. 2d 720, 724 (W.D. Tex. 2008) ("[T]he ALJ may give little weight, or completely reject a treating physician's opinion when there is reliable medical

evidence from a treating or examining physician that controverts the treating specialist's opinion."). The ALJ's implicit rejection of Dr. Nguyen's questionnaire in assessing Plaintiff's physical RFC was not erroneous and is supported by substantial evidence in the record.

**D.     RFC Assessment**

Plaintiff also argues that the ALJ's RFC assessment is not supported by substantial evidence because his well-documented "muscle weakness, shortness of breath, cervical kyphosis, and bilateral knee crepitus" "adversely impact[ed] [his] ability to perform the bending, stooping, and exertional requirements of medium work."  (Pl. Br. at 8–12.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  The claimant's RFC should be "based on all of the relevant medical and other evidence," including opinions submitted by treating physicians and other acceptable medical sources, and should account for all of the claimant's "medically determinable impairments . . . including [those] that are not 'severe.'"  *See* 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she

does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Johnson*, 864 F.2d at 343 (citations omitted).

As noted, the ALJ adopted the ME's opinion that through his date last insured, Plaintiff had the RFC to perform a full range of medium work. (R. at 30.) In determining Plaintiff's RFC during the relevant disability period, the ALJ "considered all symptoms and the extent to which [they] [could] reasonably be accepted as consistent with the objective medical evidence." (R. at 31.) The acknowledged Plaintiff's testimony that he: (1) "suffered [from] chronic, severe pain in all [of his] joints"; (2) had "difficulty sitting, standing, and walking" and "developed depression"; (3) experienced pain in his hands that caused him "trouble buttoning his clothes and tying his shoes"; and (4) had "numbness and diminished strength in his shoulders and hands and had severe headaches." (R. at 31, 52, 58–62.) He concluded that based on the medical evidence, Plaintiff's allegations about the limiting effects of his impairments were "not fully credible." (R. at 31.)

The ALJ considered important Dr. Silverman's January 10, 2010 consultative findings that Plaintiff had a full range of motion in all of his joints "with no swelling, redness, or warmth" and had "no neurological deficits." (R. at 32, 272.) He implicitly accepted Dr. Silverman's opinion that there was no evidence of rheumatoid arthritis in the medical record. (*Id.*) The ALJ also noted that throughout the relevant time period, Plaintiff "received treatment for [his] allegedly disabling symptoms" that was "essentially routine and/or conservative" in nature and was "not . . . the type of medical treatment one would expect for a totally disabled individual." (R. at 32–33.) Ultimately, the ALJ adopted the ME's testimony that the "objective findings" did not support Plaintiff's a finding of disability. (R. at 32, 76.)

As discussed, the ALJ's RFC assessment should be based on all of the relevant evidence in the record and should account for all of the claimant's impairments, including those that are non-severe. *See* 20 C.F.R. § 404.1545(a)(3). Even though for purposes of his Title II claim, Plaintiff's relevant medical history spanned from August 2010 to December 31, 2010, most of the medical evidence that he cites in support of request for remand dates outside of this period. He points, for example, to Dr. Ventura's at LA Veterans February 17, 2009 diagnosis of carpal tunnel syndrome and prescription for a prosthetic aid for his right wrist. (R. at 351, 355) ( Pl. Br. at 9). He also references an MRI taken that day showing he had "disc protrusions in his cervical spine" and a "mild deformity of the ventral cord." (R. at 354) ( Pl. Br. at 12). He points to Dr. Chowdhery's findings during her consultations on November 3 and December 10, 2009. (R. at 231–250) (Pl. Br. at 12).

Even if this evidence were relevant to Plaintiff's disability period, as the trier of fact, the ALJ was entitled to weigh it against other objective findings, including the opinion evidence available, and the record as a whole. Although Plaintiff emphasizes Dr. Chowdhery's observation on

-24-

December 10, 2009, that he had "slight cervical kyphosis," X-rays taken that same day showed that his cervical spine was "normal." (R. at 231, 250.) Similarly, while Dr. Nguyen noted that Plaintiff's hands showed chronic changes indicative of degenerative joint disease, the X-rays of his hands that were in the record indicated that these changes were "mild." (*See* R. at 234–35). When Dr. Silverman reviewed Plaintiff's records on January 10, 2010, he found no evidence of rheumatoid arthritis. (R. at 273.) He also observed that Plaintiff had a full range of motion in all of his joints, had no gross focal neurological deficits, and walked without assistive devices despite his "slightly antalgic gait." (*Id.*) As discussed, the ALJ was entitled to accept Dr. Silverman's findings if he found they were supported by the record. *See Copeland*, 992 F.2d 324, at *2.

After having reviewed Plaintiff's treatment records, the ME testified that some of the differential diagnoses were never confirmed. (R. at 77.) He opined that Plaintiff's allegations of disabling joint pain were not supported by the objective evidence since he did not exhibit symptoms such as swelling, limited range of motion, localized tenderness, redness, heat sensation, or synovitis. (R. at 77–79.) The ALJ could properly rely on the ME's opinion in discounting Plaintiff's subjective complaints about the severity and limiting effects of his pain and other ailments because a claimant's allegations must be corroborated by the medical evidence. *See Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) ("The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain will not take precedence over conflicting medical evidence."); *see also* 42 U.S.C. § 423(d)(5)(A) (providing that the claimant's statements regarding "pain and other symptoms" must be corroborated by the objective medical evidence).

Moreover, many of the treatment records Plaintiff cites, such as those from Dr. Ventura's February 2009 and Dr. Chowdhery's November and December 2009 consultations, date to a time

when according to his own testimony, he was still working as a construction contractor and a Wal-Mart stocker.  (*See* R. at 47–48, 50, 231–250, 350–61.)  Plaintiff's ability to perform these jobs despite his alleged chronic joint pain, muscle weakness, shortness of breath, cervical kyphosis, and bilateral knee crepitus supports the ALJ's finding that any resulting functional limitations were not disabling.  *See Gibson v. Astrue*, No. 3:11–CV–733–BH, 2012 WL 10411, at *8 (N.D. Tex. Jan.3, 2012) ("A claimant's ability to work for several years with the same impairments that the claimant [later] allege[s] to be disabling supports a finding of not disabled.") (citing *Vaughn v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995)).  Also during this time, Dr. Chowdhery prescribed him pain medication and instructed him to take warm soaks to treat his chronic joint pain.  (*See* R. at 235, 260.)  Such conservative treatment supports the ALJ's finding that Plaintiff's pain was not so severe as to render him disabled.  *See Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986) (holding that "[a] medical condition that can reasonably be remedied is not disabling"); *Andrews v. Astrue*, 917 F. Supp. 2d 624, 640, 645 (N.D. Tex. 2013) (affirming the ALJ's finding of not disabled where the claimant received only conservative treatment for her back pain).  In sum, the ALJ's narrative discussion shows he applied the correct legal standards and considered all of the relevant evidence.  Substantial evidence therefore supports the ALJ's RFC assessment and remand is not required.

### III.  CONCLUSION

The Commissioner's decision is wholly **AFFIRMED.**

**SO ORDERED** on this 27th day of March, 2014.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

-26-